T.C. Memo. 1997-128


UNITED STATES TAX COURT


EUGENE J. PHILLIPS AND BARBARA A. PHILLIPS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8990-95.                    Filed March 11, 1997.


<u>Thomas J. Hall</u>, for petitioners.

<u>John C. McDougal</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined deficiencies in

petitioners' Federal income taxes and penalties as follows:

|  | | Penalty |
| Year | Deficiency | Sec. 6662(a) |
| 1991 | $14,997 | $2,999 |
| 1992 | 18,847 | 3,769 |
| 1993 | 17,898 | 3,580 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues to be decided are as follows:

1. Whether petitioners engaged in a horse breeding activity with an actual and honest profit objective; and

2. whether petitioners are liable for penalties on income tax pursuant to section 6662.

FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91. The parties' stipulations of fact are incorporated herein by reference and are found as facts in the instant case.

At the time they filed their petition in the instant case, petitioners Eugene J. Phillips (Mr. Phillips) and Barbara A. Phillips (Mrs. Phillips) resided in Stuart, Virginia, at their farm, known as Green Pines Farm. Petitioners filed joint U.S. Individual Income Tax Returns (Forms 1040) for each of the years in issue.

During the years in issue, Mr. Phillips was employed as a nurse anesthetist, and Mrs. Phillips was engaged in the rearing and breeding of Arabian horses (Arabians) and quarter horses (hereinafter horse activity) on petitioners' farm. Besides her involvement with the horse activity, Mrs. Phillips was not employed during the years in issue.

During 1965, Mr. Phillips purchased a quarter horse for Mrs. Phillips as a Mother's Day gift. Every year or every 2 years thereafter, petitioners purchased another quarter horse. During 1972, petitioners moved to Louisiana. By the early 1980's, in addition to breeding quarter horses, petitioners had a cattle operation. During 1982 or 1983, petitioners began filing a Schedule F with their income tax returns, claiming that their horse activity was a business.

During 1985, petitioners decided to change the focus of their horse activity from quarter horses to Arabians when they purchased Bella Joya, an Arabian filly, along with 11 other Arabians. Petitioners financed the total purchase price for the horses of $17,350 with a mortgage on the horses (purchase money mortgage). At the time of the purchase, petitioners owned another Arabian horse, which they had saved from going to slaughter. By 1987, petitioners sold all of their cattle.

During 1986, Bella Joya won several races at Delaware Park, including the Delaware Arabian Stakes. During 1987, Bella Joya was named the Filly of the Year by Arabian Horse World, the Racehorse of the Year by Arabian Horse Express, and the International Arabian Three-Year-Old Horse of the Year by the International Arabian Horse Association. Additionally, during 1987, Bella Joya won a Darley Award for excellence in Arabian racing.

During 1986 and 1987, the 2 years that she raced, Bella Joya won a total of $42,000 in purses. The total cost of training and boarding Bella Joya during those years was $40,000. Petitioners used the $2,000 in net winnings from Bella Joya to breed another mare.

During 1987, Mrs. Phillips developed an angina condition, which was treated by cardiac catheterization and from which her recuperation took approximately 6 months and caused her to reduce her level of activities. During 1988, Mrs. Phillips developed acute cholecystitis, which was treated by surgery to remove her gall bladder and from which her recuperation lasted approximately 4 months and caused her to reduce her level of activities.

During 1988, Mr. Phillips lost his job in Louisiana. He obtained a position in Virginia and moved there at the end of 1988. Subsequently, petitioners moved their horse activity from Louisiana to Virginia during 1988 and 1989. Petitioners chose their current location in Stuart, Virginia, because they believed that they could retire there with their horse farm.

On October 3, 1988, petitioners filed for bankruptcy under chapter 13 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the Western District of Louisiana in order to protect and to maintain their investment in their horse activity. Pursuant to bankruptcy court order, petitioners made monthly payments of $2,000 for 43 months and, then, monthly payments of $1,600 for 17 months. Petitioners' bankruptcy plan included the

purchase money mortgage on their Arabian horses.  Petitioners were discharged of their debt pursuant to their bankruptcy plan on December 29, 1993.

During January 1990, petitioners hired a contractor to build a horse barn on their farm in Virginia.  The barn was designed to be 80 feet by 250 feet, with 32 stalls, an indoor riding arena, a tack room, and a feed room.  Petitioners planned to use the barn to board horses, train horses, teach horse classes in connection with Farrier College, and contain a tack shop to sell riding equipment.  The contractor, however, went bankrupt and did not build the barn.  Consequently, petitioners built smaller barns to serve as stalls for some of their horses.  At the time of trial, petitioners still planned on building the original, larger barn.

During 1990, Mrs. Phillips was involved in an automobile accident in which she fractured her back, a clavicle, and some ribs, as well as suffering a contused lung.  These injuries were initially treated with a back brace and bed rest, and her recuperation lasted approximately 18 months and caused her to reduce her level of activities.  During 1991, Mrs. Phillips developed spinal cord compression, with nerve deficit, and paralysis.  This condition was treated with surgery to fuse and to support several vertebrae.  Her recuperation from the surgery lasted approximately 12 months and caused her to reduce her level of activities.

During 1990, Bella Joya produced a foal, after having been bred to Wiking, a prize-winning stallion.  The foal, however, cut its leg off in an accident and had to be put to sleep.  During 1995, Bella Joya produced another foal, which petitioners intend to race.

During the years in issue, when she was healthy, Mrs. Phillips spent approximately 35 to 40 hours a week on petitioners' horse activity.  During the years in issue, Mr. Phillips spent approximately 10 to 15 hours a week feeding and caring for the horses.

During 1992 and 1993, Mrs. Phillips served on the Racing Committee of the Virginia Arabian Horse Association, attending monthly meetings in Richmond, Virginia.  During those years, Mrs. Phillips also served as a District Director for the Virginia Arabian Horse Association, presiding and speaking at monthly district meetings.  In these positions, she met agriculture teachers, college professors, and 4-H people, with whom she discussed issues related to breeding horses.  Mrs. Phillips served in these positions in order to advertise petitioners' horse activity and to meet potential buyers.

During 1992 and 1993, Mrs. Phillips was also active in the American Horse Association, the Virginia Quarter Horse Association, the Virginia Horse Council, the Roanoke Valley Horsemen Association, the International Arabian Horse Association, the Arabian Registry, and the Virginia Horse

Association. She was not active in these organizations during 1991 because of her health problems.

Mrs. Phillips conducted racing seminars at various conventions and wrote a column on horse issues in The Virginia Horse Trader. Additionally, petitioners annually attended Arabian horse conventions, where they rented a booth, showed a tape of Bella Joya, distributed business cards, answered questions about racing, discussed breeding, and consulted with experts at marketing and management seminars. Petitioners had a portrait painted of their stakes winner, Bella Joya, which they displayed at conventions. Petitioners also have stationery with the name of their farm, Green Pines.

For each year in issue, petitioners maintained their financial information in a Farm Record Book (farm book), which was published by the Farm Credit Service. In each farm book, petitioners classified expenses under various categories, e.g., "Labor Hired", "Feed Purchased", "Breeding Fees and Veterinary Costs", and "Other Expenses", and calculated an annual, and sometimes quarterly, total for each category. Petitioners maintained records on each of their horses indicating the pedigree and physical condition of the horses. Additionally, petitioners prepared an action plan projecting when a mare was to come in season and to be bred and to which stallion she was to be bred.

Petitioners registered many of their Arabian horses with the International Arabian Horse Association. Registering a horse entails hiring a veterinarian; paying for a representative of the International Arabian Horse Association to be present; having a blood test performed on the horse; freeze branding the horse on the neck and, if it is racing, in the lip; and preparing registration papers. Each registration costs several hundred dollars.

During the years 1988 to the present, petitioners owned 32 horses, excluding 5 foals that they sold. During those same years, 9 of petitioners' 32 horses have been bred. Finally, during those years, 5 horses have been sold, for a total of approximately $2,600. During the years 1988 to the present, none of petitioners' horses has raced or competed in shows, except on a very minor basis. No show activity was conducted for income. After moving to Virginia, petitioners received several offers to purchase various horses, but petitioners accepted none of them, deeming them too low. Petitioners did not place any of their horses for sale at auctions.

Petitioners used their geldings for teaching or show purposes, trail riding, and carriages. Additionally, petitioners used one gelding for Special Olympics children and showed him. Other geldings are used for bridleless/saddleless teams. Finally, petitioners used geldings for children of potential buyers to ride when visiting petitioners' farm.

Petitioners' Virginia farm and land, purchased in 1988 for $90,000, were appraised during 1995 at a fair market value of $155,000. Petitioners' 8 registered quarter horses were appraised during 1995 at a total fair market value of $10,000. Petitioners' 22 registered Arabian horses were appraised during 1995 at a total fair market value of between $86,000 and $96,000. Petitioners own 6 horses which were not appraised because they are half Arabian/half quarter horse, and petitioners thought that they were not worth insuring.

During the years in issue, petitioners incurred losses on their horse activity as follows:

|      | Income | Depreciation | Other Expenses | Income/(Loss) |
|------|--------|--------------|----------------|---------------|
| 1991 | $114   | ( $6,274)    | ( $56,874)     | ( $63,034)    |
| 1992 | -      | ( 7,756)     | ( 61,235)      | ( 68,991)     |
| 1993 | -      | ( 7,697)     | ( 54,513)      | ( 62,210)     |
|      | $114   | ($21,727)    | ($172,622)     | ($194,235)    |

During the years in issue, petitioners received income from Mr. Phillips' military retirement pay and other sources, as follows:

|      | Wages   | Retirement Pay | Interest & Dividends | Total    |
|------|---------|----------------|----------------------|----------|
| 1991 | $74,246 | $25,464        | $21                  | $99,731  |
| 1992 | 87,432  | 26,384         | 125                  | 113,941  |
| 1993 | 89,271  | 27,180         | 129                  | 116,580  |

Losses sustained by petitioners were out-of-pocket economic losses with the exception of amounts deducted for depreciation.

Since 1988, Mr. Phillips inherited approximately $25,000 to $30,000, all of which petitioners invested in their horse

activity. Similarly, since 1988, Mrs. Phillips inherited some funds, all of which petitioners invested in their horse activity.

At the time of trial, Mr. Phillips had not ridden a horse for approximately 10 years, and Mrs. Phillips was unable to ride because of her heart problems and back problems. Prior to her health problems, Mrs. Phillips rode some horses only to prepare them for racing, sale, or show. Both petitioners pursue other recreational activities.

At the time of trial, Mr. Phillips was receiving a military retirement pension, which, if he predeceases her, Mrs. Phillips would lose, leaving her with only Social Security payments and the income from the horse activity to live on. Petitioners intend to develop a horse business that will support them when Mr. Phillips retires from his employment as a nurse anesthetist, provide a source of income to Mrs. Phillips if Mr. Phillips should predecease her, and leave a business to their children.

OPINION

Respondent contends that petitioners did not conduct their horse activity with an actual and honest profit objective and that, therefore, losses for the years in issue are nondeductible, except to the extent of income from the activity. Petitioners contend that they engaged in their horse activity with the requisite profit objective and that they are, therefore, entitled

to deduct activity expenses in excess of activity income. Petitioners bear the burden of proof. Rule 142(a).

Section 183(a) provides the general rule which disallows all deductions attributable to activities "not engaged in for profit." Section 183(b)(1), however, qualifies the general rule by allowing those deductions otherwise allowable regardless of profit objective, e.g., State and local taxes. Further, section 183(b)(2) allows those deductions which would be allowable if the activity were engaged in for profit, but only to the extent that gross income attributable to the activity exceeds the deductions permitted by section 183(b)(1).

Section 183(c) defines a section 183 activity as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Deductions under sections 162 or 212(1) or (2) require the "actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). A taxpayer's expectation of profit, however, need not be "reasonable." Dreicer v. Commissioner, supra at 644-645; sec. 1.183-2(a), Income Tax Regs.

Whether a taxpayer has an actual and honest profit objective is decided on the basis of all surrounding circumstances.

Dreicer v. Commissioner, supra at 645; sec. 1.183-2(b), Income Tax Regs. We give greater weight to objective facts than to a taxpayer's statement of intent. Dreicer v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., contains a nonexclusive list of objective factors to be considered in deciding whether an activity is engaged in for profit. Allen v. Commissioner, 72 T.C. 28, 33 (1979). The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or the taxpayer's advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.

No single factor is determinative; all facts and circumstances, including those not listed, should be considered. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); sec. 1.183-2(b), Income Tax Regs. Moreover, we do not resolve the issue of profit objective by simply comparing the number of factors

indicating profit objective with those indicating the lack of such objective. Sec. 1.183-2(b), Income Tax Regs.

If gross income derived from a horse training or breeding activity for 2 or more taxable years in a period of 7 consecutive taxable years exceeds the deductions attributable to such activity, then the activity is presumed to be an activity engaged in for profit. Sec. 183(d). In the instant case, as gross income from the activity did not exceed deductions from the activity during any of the years in issue, petitioners are not entitled to the presumption that their horse activity was engaged in for profit. Consequently, we address the aforementioned factors to decide whether petitioners engaged in their horse activity with an actual and honest profit objective during the years in issue.

The manner in which petitioners carried on their horse activity indicates that they engaged in the activity with the requisite profit objective. The regulations provide that "The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit." Sec. 1.183-2(b)(1), Income Tax Regs. As to whether petitioners carried on their horse activity in a businesslike manner, respondent concedes that petitioners engaged in the following

"business practices": Using business stationery, advertising their farm at horse conventions and seminars (including displaying their portrait of Bella Joya and showing a video of Bella Joya's races), and participating in various horse associations. Respondent, however, argues that such practices do not counter "the unbusinesslike way in which petitioners have made the major decisions about the conduct of their activity."

Respondent argues that petitioners had no financial plan or written budget for the horse activity and that petitioners never attempted to calculate the income that was required to produce a profit for any year, or the projected income that would be required in future years to produce a profit. Additionally, respondent contends that petitioners never calculated the cost of each component of their horse activity, or the cost of their horse activity on a per horse basis, in order to determine possible cost-cutting measures. Finally, respondent argues that petitioners, after they began to incur losses, made no effort to consult experts on how to change their operations to cut costs and increase profits.

In the instant case, we conclude that petitioners carried on their horse activity in a businesslike manner. Petitioners engaged in the business practices discussed above. Additionally, although they produced no financial plan or written budget,

petitioners maintained a business plan, which was to expand their horse activity so that it could, among other things, support Mrs. Phillips in the event that Mr. Phillips predeceased her. The business plan was evidenced by their actions: Petitioners contracted to build a barn and a tack shop for their horse activity, bred Bella Joya to produce foals, and registered many of their Arabians with the International Arabian Horse Association.

During the years in issue, however, numerous circumstances beyond their control prevented petitioners from proceeding with their business expansion plan. Mrs. Phillips encountered several health problems that prevented her from pursuing petitioners' horse activity to the fullest. Bella Joya's first foal, which would likely have garnered a significant amount of income, had to be put to sleep. The barn was not completed before Mrs. Phillips' automobile accident, so petitioners had to delay construction of the barn and tack shop. Consequently, petitioners continued to sustain boarding expenses and lost potential boarding income. We consider also the fact that petitioners were making payments under chapter 13 bankruptcy. We believe that, during the years in issue, petitioners did all that they could to sustain their horse activity until Mrs. Phillips recovered.

As to the calculation of income that would be required in future years to produce a profit, Mrs. Phillips testified that she hoped that the horse activity would be profitable within 6 to 8 years after petitioners began focusing on Arabians. Petitioners calculated the cost of each component of their horse activity, categorizing their expenses in their farm books under, inter alia, "Labor Hired", "Feed Purchased", and "Breeding Fees and Veterinary Costs". Additionally, Mrs. Phillips testified that she calculated the cost of their horse activity on a per horse basis. Accordingly, petitioners knew the amount of income that would be required in future years. Finally, Mrs. Phillips testified that she attended seminars on management and marketing at Arabian horse conventions. Accordingly, we conclude that petitioners carried on their horse activity in a businesslike manner.

As to whether petitioners maintained complete and accurate books and records, respondent contends that petitioners' financial records are "nothing more than gross chronological lists of expenditures which do not permit a detailed analysis of the various parts of the activity". Additionally, respondent argues that the records contain many expenditures that are not farm related, e.g., AARP dues, lottery tickets, and air conditioning for the residence. As to petitioners' records on

their horses, respondent argues that they consist of only a registration application, which shows the bloodline and physical description of each horse. Citing Golanty v. Commissioner, 72 T.C. 411, 431 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981), respondent contends that such records are the bare minimum needed to identify horses and are as consistent with a hobby as with a business.

Petitioners contend that they included in the farm books expenses that they thought might be deductible for tax purposes. Petitioners argue that they completed the farm books and sent them to their accountant, who decided what expenses were deductible. Petitioners argue that, as to the records on their horses, petitioners registered many of their Arabians with the International Arabian Horse Association, which included blood testing and freeze branding the horses.

In the instant case, we conclude that petitioners maintained complete and accurate books and records. During each year in issue, petitioners kept a farm book, which was published by the Farm Credit Service. In each farm book, petitioners classified expenses under various categories, e.g., "Labor Hired", "Feed Purchased", "Breeding Fees and Veterinary Costs", and "Other Expenses", and calculated an annual, and sometimes quarterly, total for each category. Contrary to respondent's assertion,

petitioners performed a detailed analysis of each part of their horse activity.

Additionally, we disagree with respondent that petitioners' records contain "many expenditures" that are not farm related. All expenses that were not categorized under a heading such as "Labor Hired" or "Feed Purchased" were placed by petitioners under "Other Expenses". The expenses cited by respondent as not being related to the farm were all categorized as "Other Expenses". We are persuaded by Mrs. Phillips' testimony that petitioners' procedure was to include in their farm books expenses which might be deductible, leaving the determination of deductibility to their accountant. Although some expenses listed in the farm books were ultimately determined not to be farm related, petitioners nevertheless categorized all of their expenses and periodically calculated the category totals. As to their records on their horses, petitioners maintained records indicating the horses' pedigree and physical condition, registered many of their Arabian horses with the International Arabian Horse Association, and kept an action plan for each breeding mare, projecting when she was to come in season and to be bred and to which stallion she was to be bred. Based on our review of the record, we conclude that petitioners maintained

complete and accurate records and books within the meaning of section 1.183-2(b)(1), Income Tax Regs.

The regulations also provide that "A change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive." Sec. 1.183-2(b)(1), Income Tax Regs. Respondent contends that petitioners continued their activity in essentially the same manner they had in previous years, despite suffering growing losses year after year. Respondent argues that petitioners could have increased profitability by selling some or all of the unproductive animals. Additionally, respondent argues that petitioners' lack of effort to reduce costs and to increase profitability is evidence of the lack of a genuine profit objective. Specifically, respondent contends that petitioners lacked a profit motive because they increased the costs of maintaining their herd during the years 1989 through 1993 by: (1) Failing to sell any horse after 1989, (2) acquiring two horses at a cost of $1,300, and (3) spending $6,500 in stud fees to produce three half Arabians. Additionally, respondent challenges the efficacy of petitioners' advertising efforts at Arabian horse conventions when, by petitioners' own testimony, they were unable to sell horses or to increase breeding activity

because of their bankruptcy. Respondent also questions petitioners' intention to build the barn, arguing that, as petitioners had enough funds to spend on horse purchases and stud fees to produce half Arabians, petitioners were financially able to build the barn.

As to respondent's argument that petitioners did not attempt to make changes in their operating methods and to reduce costs in order to improve the profitability of their horse activity, we disagree. Petitioners planned to begin horse boarding, horse training, teaching classes in connection with Farrier College, and operating a tack shop to sell equipment. Petitioners hired a contractor to build a 32-stall horse barn on their farm, which would have served both as a stable for the horses and as a location for the tack shop. When the contractor went bankrupt, petitioners built smaller barns to reduce the cost of boarding some of their horses. Finally, during the years in issue, petitioners attempted to sell horses but received offers that they considered too low.

As to whether petitioners could have increased the profitability of their horse activity by selling some or all of their unproductive animals, we cannot conclude on this record that any of the animals were "unproductive". Mrs. Phillips, for example, testified that one gelding was used for Special Olympics

children and that other geldings were used for bridleless/saddleless teams. Additionally, geldings were helpful in entertaining children of potential buyers.

We disagree with respondent's contention that petitioners increased the costs of maintaining their herd. Mrs. Phillips testified that they attempted to sell some horses but that they received unacceptably low offers. As to the purchase of two horses for $1,300 and the outlay of $6,500 in stud fees, respondent essentially argues that petitioners exercised bad business judgment as to those transactions. We do not conclude that the expenses were either inconsistent with a profit motive or unnecessary and extravagant.

Furthermore, we disagree with respondent's contention that petitioners' advertising efforts at horse conventions were ineffectual. As we have stated above, we believe that, during the years in issue, petitioners were merely sustaining their horse activity until Mrs. Phillips could proceed with the expansion plans once she recovered. Although petitioners were unable to increase substantially the level of horse breeding during the bankruptcy period, we view their attendance at horse conventions as efforts to sustain both their name and their farm's name in the Arabian horse industry. Accordingly, we

believe that petitioners' attendance at horse conventions was helpful to their horse activity.

As to the barn and tack shop, we are persuaded by Mrs. Phillips' testimony that the barn was not built because she was involved in an automobile accident. At trial, petitioners testified that they still planned on building the barn. In fact, petitioners later built smaller barns in order to save on boarding costs. Accordingly, we conclude that both petitioners' planned, unconstructed barn and the smaller, constructed barns constitute adaptations in their operating methods, and that such adaptations, along with the other actions taken by petitioners, discussed supra, are consistent with an intent to improve the profitability of their horse activity.

Section 1.183-2(b)(2), Income Tax Regs., provides:

> Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. * * *

Respondent argues that petitioners did not establish that they "focused their efforts on the business or economic aspects of the activity." Respondent contends that the fact that the information recorded by petitioners "did not lend itself to analyses along cost or profitability lines is strong evidence

that such matters were of relative indifference to them when compared to the management and care of the horses themselves." Alternatively, respondent argues that petitioners did not establish that they consulted experts one-on-one regarding the business aspects of raising horses.

Petitioners argue that they knew the business and economic aspects of their horse activity. Petitioners contend that they have spent a considerable amount of time and effort to learn about the Arabian horse and quarter horse industries by attending seminars at conventions and colleges. Additionally, petitioners made a budget, estimated when the horse activity would be profitable, and determined the costs per horse per month.

Petitioners also contend that Mrs. Phillips herself is an expert in horse breeding. Additionally, in the positions that she held, Mrs. Phillips met agriculture teachers, college professors, and 4-H people, with whom she discussed horse breeding issues. Finally, petitioners argue that they consulted with experts at horse conventions, where there were marketing and management seminars.

The regulations provide that consulting with experts regarding an activity's accepted practices may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Sec. 1.183-2(b)(2),

Income Tax Regs. Mrs. Phillips has served as a District Director and as the Chairman of the Racing Committee for the Virginia Arabian Horse Association. Additionally, Mrs. Phillips has conducted racing seminars at various conventions and written a column answering questions in The Virginia Horse Trader. Moreover, petitioners consulted with experts at horse convention seminars. Accordingly, Mrs. Phillips' expertise in the horse activity and petitioners' consultation with experts are facts in petitioners' favor.

Section 1.183-2(b)(3), Income Tax Regs., provides that

> The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. * * *

Respondent concedes that this factor "superficially favors petitioners" but argues that there are "substantial pleasure or recreational aspects" to their horse activity.

Mr. Phillips is employed full time as a nurse anesthetist. Generally, however, he works 10 to 15 hours per week in petitioners' horse activity, primarily taking care of the horses. He also attends seminars and conventions dealing with petitioners' horse activity.

Mrs. Phillips works full time in the horse activity, generally spending 35 to 40 hours per week. In addition to being

responsible for the day-to-day aspects of the activity, during the years in issue, she was active in various organizations associated with the horse industry, including the American Horse Association, the Virginia Quarter Horse Association, the Virginia Horse Council, the Roanoke Valley Horsemen Association, the International Arabian Horse Association, the Arabian Registry, and the Virginia Horse Association. Additionally, Mrs. Phillips served as a District Director and as the Chairman of the Racing Committee for the Virginia Arabian Horse Association. She conducted racing seminars at various conventions and answered questions as a columnist in The Virginia Horse Trader. Accordingly, we conclude that the fact that petitioners devote much of their personal time and effort to carrying on their horse activity indicates an intention to derive a profit.

Section 1.183-2(b)(4), Income Tax Regs., provides that "The term 'profit' encompasses appreciation in the value of assets, such as land, used in the activity." Accordingly, the regulations state that

> the taxpayer may intend to derive a profit from the
> operation of the activity, and may also intend that,
> even if no profit from current operations is derived,
> an overall profit will result when appreciation in the
> value of land used in the activity is realized since
> income from the activity together with the appreciation
> of land will exceed expenses of operation. * * *
> [Id.]

Section 1.183-1(d)(1), Income Tax Regs., however, provides:

> If the taxpayer engages in two or more separate activities, deductions and income from each separate activity are not aggregated either in determining whether a particular activity is engaged in for profit or in applying section 183.

In other words, two activities will be considered separate activities with respect to ascertaining a profit objective when there is no net income from one activity to reduce the cost of the second activity. See sec. 1.183-1(d)(1), Income Tax Regs.

Petitioners argue that they have invested in two assets: (1) The horses and (2) the horse farm and the land on which it is located. Respondent argues that the horse farm and the land are not relevant to the instant case because petitioners' horse activity never produced income in excess of expenses.

We conclude that petitioners' horse farm and land are not to be considered as a single activity along with petitioners' horse activity. During the years in issue, the horse activity did not reduce the net cost of carrying the horse farm and land for their appreciation in value. Sec. 1.183-1(d)(1), Income Tax Regs. Accordingly, we consider the horse activity and the horse farm and land as separate activities in deciding whether a profit objective existed.

Based on our review of the record, we conclude that petitioners intended that an overall profit would result from the

operation of their horse activity and from the appreciation in the value of the horses once it was realized. Petitioners had a world champion Arabian, Bella Joya, which earned them a substantial amount of money. Petitioners bred Bella Joya to Wiking, another champion horse, to produce a foal that they could race. The foal, however, had to be put to sleep. Bella Joya has produced another foal, which petitioners intend to race. Additionally, petitioners' horses were appraised in 1995 at a value of between $96,000 and $106,000.

During the years in issue, however, petitioners were hampered by their bankruptcy payments and by Mrs. Phillips' numerous medical problems. Once they are no longer hindered by such considerations, petitioners will be able to invest more time and money on their horse activity. Accordingly, based on the record, we conclude that petitioners intended that an overall profit would result from the operation of their horse activity and from the appreciation in the value of the horses once it was realized.

Section 1.183-2(b)(6), Income Tax Regs., provides that "A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit." The regulations continue:

> If losses are sustained because of unforeseen or
> fortuitous circumstances which are beyond the control
> of the taxpayer, * * * such losses would not be an
> indication that the activity is not engaged in for
> profit.  * * *  [Sec. 1.183-2(b)(6), Income Tax Regs.]

Additionally, section 1.183-2(b)(7), Income Tax Regs., provides

that

> The amount of profits in relation to the amount of
> losses incurred, and in relation to the amount of the
> taxpayer's investment and the value of the assets used
> in the activity, may provide useful criteria in
> determining the taxpayer's intent.  * * *

Petitioners argue that they sustained losses because of unforeseen circumstances beyond their control, viz, Mr. Phillips' loss of his job, Mrs. Phillips' health problems, and their chapter 13 bankruptcy.  Petitioners argue that the period of time it has taken them to develop their horse activity is not out of line with the period seen in other cases, citing Pirnia v. Commissioner, T.C. Memo. 1989-627.  Additionally, petitioners argue that the fact that they have not realized gross income in their horse activity during each of the years in issue is not by itself evidence that they lack the requisite profit objective.

Respondent argues that petitioners' consistent history of losses during the period 1987 through 1993 is persuasive evidence that petitioners did not expect to make a profit, citing Golanty v. Commissioner, 72 T.C. at 427.  Respondent, conceding that petitioners encountered unforeseen circumstances, nonetheless

argues that "it is petitioners' reactions to these factors which reveal the most about their motivations in running the activity." Respondent argues that petitioners continued their activity "as usual", buying additional horses and breeding more unshowable, unraceable, and relatively unsalable half Arabians. Additionally, respondent argues that petitioners could have avoided bankruptcy altogether by selling Bella Joya for an amount approximating their total debt.

Respondent argues that petitioners lacked a profit objective because they only bred Bella Joya twice in 6 years. Respondent argues that petitioners' decision to place their horse activity on hold for several years, during which they accumulated another $280,000 of losses in order to keep Bella Joya, clearly demonstrates that their actions are motivated by something other than profits. Additionally, respondent contends that petitioners could have sold their less productive animals in order to cut down on expenses. Respondent argues that the fact that they did not suggests that the real reason for the magnitude of their losses was their desire to keep all of their horses.

Additionally, respondent argues that the absence of a profit as far back as 1988 (the first year for which records are available) indicates the lack of a profit motive. Respondent argues that Arabian breeding is not a highly speculative venture

with high stakes. Respondent argues that, even if petitioners had sold Bella Joya for the $180,000 asking price, there was no prospect of recouping the cumulative losses for the activity, as distinguished from Eisenman v. Commissioner, T.C. Memo. 1988-467.

We conclude that petitioners began their horse activity during 1985 when they decided to change the focus of their horse activity from quarter horses to Arabians upon purchasing Bella Joya, along with 11 other Arabians. We have previously noted that the startup phase of an American saddle-bred breeding operation is 5 to 10 years. Engdahl v. Commissioner, 72 T.C. 659, 669 (1979). Similarly, we conclude in the instant case that a period of 5 to 10 years for the startup phase of an Arabian breeding operation is not unreasonable and hold that the years in issue encompassed a startup period.

The losses sustained by petitioners during the startup period were the result of unforeseen circumstances beyond the control of petitioners, viz, Mr. Phillips' loss of his job, Mrs. Phillips' health problems, and their chapter 13 bankruptcy. Sec. 1.183-2(b)(6), Income Tax Regs. We have addressed, supra, the changes that petitioners either made or attempted to make in order to minimize their losses. As petitioners' series of losses were sustained because of unforeseen circumstances beyond their

control, we conclude that such losses are not an indication that the activity is not engaged in for profit.

Section 1.183-2(b)(8), Income Tax Regs., provides that

> The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved.

Petitioners argue that the fact that they spent a substantial amount of their gross income and all of their inheritance moneys on the horse activity is strong evidence that they are engaged in it for profit. Petitioners argue that they "are sacrificing a higher living standard today for the expectation of enjoying substantial profits in the future."

Respondent argues that petitioners' substantial income from other sources "has allowed them to continue funding their horse operation despite the heavy losses". Respondent argues that petitioners' activity "is sustainable, even on a current basis, only through outside funds."

In the instant case, petitioners have invested in their horse activity, since 1988, all of the inheritances that they received, and, during each of the years in issue, a large percentage of their gross income, which indicates, in the

circumstances of the instant case, that the activity was not a mere "hobby." Additionally, petitioners' losses during the years in issue were out-of-pocket economic losses. As we have discussed, supra, we conclude that petitioners, during the years in issue, were attempting to sustain their horse activity until Mrs. Phillips recovered and that petitioners intended for their horse activity, among other things, to support Mrs. Phillips in the event that Mr. Phillips predeceased her. Accordingly, we believe that petitioners' use of Mr. Phillips' income to aid in sustaining the horse activity during the years in issue was warranted, given the circumstances in which petitioners found themselves, and does not indicate the lack of a profit objective.

Section 1.183-2(b)(9), Income Tax Regs., provides that "The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved." The regulations provide that

> the fact that the taxpayer derives personal pleasure
> from engaging in the activity is not sufficient to
> cause the activity to be classified as not engaged in
> for profit if the activity is in fact engaged in for
> profit as evidenced by other factors whether or not
> listed in this paragraph. [Sec. 1.183-2(b)(9), Income
> Tax Regs.]

Petitioners do not use the horses for personal riding pleasure. At the time of trial, Mr. Phillips had not ridden a

horse for approximately 10 years, and Mrs. Phillips was unable to ride because of her heart problems and back problems. Before her health problems, Mrs. Phillips rode some horses only in order to prepare them for racing, sale, or show. Consequently, we conclude that petitioners did not engage in their horse activity for its recreational or personal aspects.

We have considered respondent's remaining arguments and find them to be without merit. After considering the record as a whole, and particularly Mrs. Phillips' health problems during the years in issue, petitioners' bankruptcy, and the startup nature of petitioners' activity, we find that petitioners engaged in their horse activity for profit. We therefore hold that section 183 does not apply to petitioners' horse activity and that petitioners are entitled to deduct activity expenses in excess of activity income for the years in issue.

As we have held that petitioners are entitled to deduct activity expenses in excess of activity income for the years in issue, petitioners are not liable for the penalties for substantial understatement of income tax pursuant to section 6662.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioners</u>.