T.C. Memo. 2000-309

UNITED STATES TAX COURT

RODERICK P. STRICKLAND AND LINDA G. STRICKLAND, Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2241-99.                    Filed September 28, 2000.

<u>F. Pen Cosby</u>, for petitioners.

<u>Timothy A. Lohrstorfer</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal income tax of $13,398 for 1995 and $10,687 for 1996.

Petitioners began to breed horses in 1993 and began to board horses in 1995.  The sole issue for decision is whether petitioners operated their horse breeding and boarding activity

(horse activity) for profit under section 183 in 1995 and 1996. We hold that they did.

Section references are to the Internal Revenue Code in effect during the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. References to petitioner are to Linda Strickland.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioners

Petitioners lived in Morgantown, Indiana, when they filed their petition.

1. Linda Strickland

Petitioner was raised on a farm in Morgan County, Indiana, where her family bred and boarded horses. Her father gave her a horse when she was about 8 years old. She cared for that horse and showed it in the local 4-H club and saddle club shows. She trained registered Appaloosa horses for neighbors when she was a teenager around the early 1960's.

Petitioner bought a registered quarter horse mare in 1969 when she was about 23 years old. Petitioner bred a few quarter horse mares to a stallion she owned in the early 1970's. She raised, showed, and sold a few foals around that time. She competed at several horse shows in Indiana and nearby States.

Petitioner is the mother of Scott Waltz and Amy Stenger.

She retired from Eli Lilly & Co. (Eli Lilly) in 1993.

2. <u>Amy Stenger</u>

Amy Stenger began to ride horses when she was 3 and show horses when she was 5. She won many awards at local, State, and national shows, including the All American Quarter Horse Congress. She also won awards at the Indiana State Fair and National Quarter Pony Association.

Amy Stenger began to train horses when she was 13. When she was 16, she raised, trained, and sold a weanling filly that she had been given. She broke and trained the first mare that petitioners bought in 1993.

3. <u>Mr. Strickland</u>

Roderick Strickland (Mr. Strickland) grew up on a farm in North Carolina, where he took tobacco from the field to the barn with a mule and a sled. He rode mules and ponies when he was a young adult (in the early 1960's) and rode a horse owned by his father-in-law. He received a bachelor of science degree in crop science business from North Carolina State University in 1960. His first contact with quarter horses was in 1987 when he and petitioner began dating.

All of Mr. Strickland's work experience relates to agriculture. His employers included North Carolina State University, Ralston Purina, and Dow Elanco. He was employed as a research assistant, sales associate, marketing associate,

district sales manager, worldwide manager, national accounts manager, product manager, national sales manager, and key account executive. He developed business plans, annual budgets, annual sales forecasts, and 5-year forecasts, and plans for introducing and marketing new products. Mr. Strickland retired from Dow Elanco on December 31, 1998.

4. Petitioners' Income From Sources Other Than Their Horse and Farm Activity

Petitioner received wages or other compensation from Eli Lilly and Mr. Strickland received wages from Dow Elanco and Eli Lilly from 1992 to 1996 as follows:

| Year | Mr. Strickland | Petitioner | Total |
|------|---------------|-----------|-------|
| 1992 | $114,599 | $42,378 | $156,977 |
| 1993 | 125,947 | 94,483 | 220,430 |
| 1994 | 137,447 | 5,944 | 143,391 |
| 1995 | 200,882 | 5,094 | 205,976 |
| 1996 | 127,133 | | 127,133 |

Petitioners had other income as follows in those years:

| Year | Dividends | Interest | Rent | Total |
|------|-----------|----------|------|-------|
| 1992 | $6,659 | $2,142 | $250 | $9,051 |
| 1993 | 7,178 | 1,863 | 441 | 9,482 |
| 1994 | 7,429 | 2,484 | | 9,913 |
| 1995 | 8,372 | 3,205 | 1,396 | 12,973 |
| 1996 | 7,626 | 1,836 | | 9,462 |

B. Petitioners' Farm

Petitioner bought a farm in 1972 because she wanted to raise and train horses. Petitioner paid the following for land:

| Land | Purchase date | Cost | Cost per acre |
|------|---------------|------|---------------|
| 30 acres | July 20, 1972 | $15,000 | $500 |
| 20 acres | July 17, 1978 | 16,000 | 800 |
| 20 acres | April 1, 1980 | 20,000 | 1,000 |

Petitioner's home was on the land she bought in 1972. Petitioner had horses on her farm while she raised her children. She and her children enjoyed riding and caring for the horses. Petitioner divorced in 1982 and became financially unable to show or breed horses.

Petitioners married on July 21, 1988. At that time the land contained one old barn. There were also about 10 acres of cropland. Petitioner sold her home and about 1 acre of land in 1988. Petitioners built their present home on about 10 acres on the farm before 1990. Petitioners bought about 21 acres adjoining their property on March 20, 1995, for $2,000 per acre. Petitioners cleared about 5 of the 21 acres to use as pasture. In 1996, 50 of petitioners' 88 acres were woodland, 21 acres were cropland, 5 acres were pasture, and 10 acres were farmstead.

C. Petitioners' Horse Breeding and Boarding Activity

1. Petitioners' Use of the Land and Business Plan

Petitioners decided not to raise cattle because they neither liked nor had any experience with cattle. Since around 1992, they have sharecropped the 21 acres of tillable land with a local farmer who grows tobacco.

Petitioners began in 1993 to breed, show, and sell quarter horses. Petitioner was very familiar with them; people were moving into their area and the number of horses was growing rapidly; and they had some facilities and enough acreage to

support the activity.

Petitioners enlarged their old barn, built a new barn, and added stalls, wash racks, an indoor arena, and an office. Mr. Strickland did much of the work. Petitioners asked their certified public accountant how to set up their records. They asked successful breeders about the type of horses to acquire for their horse activity. They considered acquiring a stallion, but owning a stallion would require them to modify their facilities to do so. Petitioner ran the daily operations of their horse activity. They intended to promote their activity by being successful at horse shows. Petitioners did not have a written business plan.

2.    Horses That Petitioners Acquired, Bred, and Sold

Petitioners owned 1 horse at the end of 1992, 4 at the end of 1993, 5 at the end of 1994, 11 at the end of 1995, and 12 at the end of 1996. Petitioners bought, foaled, and sold horses as follows:

| Horse | Sex | Year Foaled or bought | Cost | Year Sold | Sale Price |
|-------|-----|------|------|-----------|------------|
| Tequila Twist | gelding | 1979 | foal | | |
| Double A Son Dee Sox | gelding | 1993 | $1,000 | 1996 | $3,800 |
| Colorful Conclusion | mare | 1993 | 2,000 | | |
| Miss Magical Colors | mare | 1993 | 3,500 | 1994 | Died |
| GS Itsstormy | mare | 1994 | 2,625 | | |
| Alpine Flowers (daughter of Title Nine) | mare | 1994 | 500 | | |
| Double A Doc's Anna (daughter of GS Itsstormy) | mare | 1995 | foal | | |
| Babes Little Luck | mare | 1995 | 4,000 | | |
| My T Prestigious | mare | 1995 | 5,000 | | |
| Tenders Lopen | gelding | 1995 | 7,000 | | |
| Title Nine | mare | 1995 | 1,500 | | |
| Title Ten | gelding | 1995 | 500 | 1996 | 2,500 |
| O So Classical (daughter of Colorful Conclusion) | mare | 1996 | foal | | |
| Shelby Prestigious (foal of Alpine Flowers) | mare | 1996 | foal | | |
| Scotch Time Lady | mare | 1996 | 3,200 | | |

Tequila Twist was a grand champion and won his color class in 1980. He also won the futurity, a major American Paint Horse Association show in 1980. He was grand champion at least 13 times. Amy Stenger showed Tequila Twist in 1996.

Petitioners campaigned Colorful Conclusion in 1995. Colorful Conclusion received at least 32 awards, including reserve national champion and grand champion.

Amy Stenger showed Tenders Lopen 15 to 20 times in 1996.

3.  Operation of the Horse Activity

Petitioner worked full time on the horse activity in 1995 and 1996.  Petitioners, their employees, or petitioner's children cleaned stalls every day in the summers of 1995 and 1996 and at least every other day in the other months.  They fed and watered each horse twice each day and turned horses out every day.  They usually trained horses each day.  The work usually took two people all day to do.  Petitioners paid Amy Stenger $5 an hour to clean stalls in 1995 and 1996.  These payments totaled $840 in 1995.

Petitioners maintained the barn, pastures, fences, arenas, and equipment.  They made many of the improvements themselves to save money.  Mr. Strickland did most of the fencing and renovation of the barns.  He built stables and stalls and installed rubber mats and automatic waterers in their barn.

Petitioner administered antibiotics, pain killers, tranquilizers, rhino shots, bandages, topical ointments, and hoof medications.  She assisted her mares with foaling.  She first taught horses to lead by halter, to stand tied, to be handled, clipped, bathed, and loaded in a trailer.  She taught yearlings to work with a bit, lunge (run in a circle), respond to voice commands, walk, trot, canter, rove, and reverse.  She prepared them for a saddle and rode them for the first time in the fall of their yearling year.  Petitioner used a slow and very involved

training process because she believed it was it was better than other methods, and it was cheaper than using a horse trainer. Petitioner also sent horses to trainers for additional training.

Petitioners advertised individual horses for sale in a local newspaper. They did not insure horses they foaled or any horse worth less than $20,000.

4. Petitioners' Boarding and Leasing Activity

Petitioners decided to board horses beginning in December 1995 to help generate more income. Based on the cost of feed, hay, sawdust, labor to clean stalls, electricity, and insurance, they concluded that it would cost about $95 per month to board a horse for a customer. They hired an attorney to write a form contract and release of liability form to use for boarding horses. They had the forms printed.

Petitioners boarded two horses in January and February 1996, three in March, six in April, four in May, five from June to August, six in September, five in October, seven in November, and four in December. They obtained customers through referrals.

Petitioners retained an attorney to write a horse lease agreement form which they had printed. Petitioners leased Tequila Twist and Babes Little Luck to local 4-H Clubs for $175 per month each from December 1, 1995, to October 31, 1996. The 4-H Club members rode the leased horses on petitioners' property. As a favor to the lessees, petitioners sometimes hauled the

leased horses to shows to which petitioners were taking other horses. Petitioners discontinued leasing horses because they believed the risk of liability offset the potential profit.

Petitioner gave (and sometimes charged for) riding lessons.

5.    Petitioners' Records and Bank Accounts

Petitioners kept income, expense, breeding, foaling, health, and farrier (horse shoe) records for their horses on their personal computer. Petitioners could prepare reports on their computer of their horse-related income and expenses for 1995 and 1996, including reports for each horse.

Petitioners used one checking account for their personal, farm, and horse-related activities from 1993 to 1995. They opened a separate checking account for their horse activity (horse account) on February 2, 1996. They deposited $16,952.60 in the horse account from February 2, 1996, to January 3, 1997. In 1996, petitioners paid about $14,000 of their horse expenses from their horse account and the rest from their personal account.

6.    Petitioners' Training and Expertise

Petitioners read magazines, reviewed sire lists, viewed videotapes, attended seminars, and spoke with quarter horse industry experts. They sought horse breeding advice from Edward M. Alderson (Alderson) and other horse breeders. Alderson had two stallions on his farm where he grows alfalfa and breeds

quarter horses.  He sold some quarter horses to petitioners.
Steven Mobley (Mobley), a certified public accountant, prepared
petitioners' income tax returns for 1993 through 1996.  Mobley
gave petitioners tax advice for their horse activity.  Alderson
and Mobley did not advise petitioners how to make their horse
activity profitable.

7.  Petitioners' Personal Pleasure From Their Horse
    Activity

Petitioner gets personal pleasure from raising, training,
and showing horses.  She enjoys going to horse shows and seeing
her horses do well.  Mr. Strickland gets pleasure from
petitioner's and Amy Stenger's success with horses and likes to
work with the foals.

D.  Horse Income and Expenses

Petitioners reported the following on their Schedules C
(Profit and Loss) for their horse activity:

Income

| | 1993 | 1994 | 1995 | 1996 | Total |
|---|---|---|---|---|---|
| Sale of foals | | | $1,700 | | $1,700 |
| Boarding | | | 400 | $10,995 | 11,395 |
| Show winnings | | $250 | 276 | | 526 |
| Riding lessons | | 160 | 60 | | 220 |
| Horse leasing | | | 175 | 2,280 | 2,455 |
| Gross income | 0 | 410 | 2,611 | 13,275 | 16,296 |

| Expenses | | | | | Total |
|---|---|---|---|---|---|
| Depreciation | 1,883 | 7,190 | 12,790 | 14,036 | 35,899 |
| Other | 7,180 | 12,887 | 20,819 | 29,189 | 70,075 |
| Total expenses | 9,063 | 20,077 | 33,609 | 43,225 | 105,974 |
| Net loss | (9,063) | (19,667) | (30,998) | (29,950) | (89,678) |

OPINION

A.    Whether Petitioners Operated Their Horse Activity for Profit

The parties dispute whether petitioners operated their horse breeding and boarding activity for profit in 1995 and 1996.[1]  In deciding whether petitioners operated their horse activity for profit, we consider the following nine factors:  (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.  See sec. 1.183-2(b), Income Tax Regs.  No single factor controls.  See Osteen v. Commissioner, 62 F.3d 356, 358 (11th Cir. 1995), affg. in part and revg. on other issues T.C. Memo. 1993-519; Brannen v. Commissioner, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); sec. 1.183-2(b), Income Tax Regs.

---

[1]  Respondent contends that petitioners' farming and horse breeding were separate activities.  Petitioners do not respond to respondent's contention.  Thus, we treat them as separate activities.

Each party cited events that occurred after 1996. We do not consider those events (other than those related to trial preparation) because those events do not show whether petitioners had a profit objective during the years in issue. See Lundquist v. Commissioner, T.C. Memo. 1999-83 n.1, affd. without published opinion 211 F.3d 600 (11th Cir. 2000); Estate of Brockenbrough v. Commissioner, T.C. Memo. 1998-454; Gustafson's Dairy, Inc. v. Commissioner, T.C. Memo. 1997-519; Choate Constr. Co. v. Commissioner, T.C. Memo. 1997-495; cf. Estate of Hutchinson v. Commissioner, T.C. Memo. 1984-55 (events occurring after the date in issue are relevant only if they shed light on the taxpayer's state of mind on the date in issue), affd. 765 F.2d 665 (7th Cir. 1985).

B.  Applying the Factors

1.  Manner in Which the Taxpayer Conducts the Activity

Maintaining complete and accurate books and records, conducting the activity in a manner substantially like comparable businesses which are profitable, and making changes in operations to improve profitability suggest that a taxpayer conducted an activity for profit. See Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979); sec. 1.183-2(b)(1), Income Tax Regs.

a.  Books and Records, Bank Accounts, and Business Plan

Respondent contends that petitioners' books and records were not adequate because they did not keep them for each horse.

Respondent points out that petitioners did not have a detailed written budget or written business plan and that they paid most of the expenses for their horse activity with personal funds.

Petitioners kept complete and accurate records on their personal computer. They could obtain reports from their computer including reports for each horse. They could identify the amount of their horse income and expenses in their personal checking account. See Engdahl v. Commissioner, supra at 667 (one checking account for horse activity, a medical practice, and personal matters).

Respondent points out that petitioners' horse activity books and records were very different from those in the corporation which employed Mr. Strickland. We think those differences are understandable, among other reasons, because the horse activity was in the early stages during the years in issue.

It is reasonable for a new activity, with very little cash flow or income, to use personal funds. Petitioners had a business plan and pursued it consistently, even though it was not written. See Phillips v. Commissioner, T.C. Memo. 1997-128 (written financial plan not required for 32-horse farm where business plan evidenced by action). Petitioners conducted their horse activity in a businesslike manner. Mr. Strickland built as much of the facilities as possible, and petitioner provided medical and training services to reduce their expenses. They

increased their number of horses from one in 1993 to 11 in 1996, and boarded other people's horses.

b.      Investigating How To Conduct the Activity

Respondent contends that petitioners did not investigate the profit potential of their horse activity before they started it. We disagree.  Petitioner has been involved with horses all of her life, and she knows the associated costs.  Petitioners knew that interest in horses was rapidly growing in their area.  Mr. Strickland had an extensive business background and was familiar with horses.  We believe that petitioners understood the profit potential.  A taxpayer need not conduct a formal marketing study to have a profit objective.  See Burger v. Commissioner, 809 F.2d 355, 359 n.6 (7th Cir. 1987), affg. T.C. Memo. 1985-523; Engdahl v. Commissioner, supra at 668.

c.      Amy Stenger's Success at Showing Horses

Respondent contends that petitioners owned ponies when Amy Stenger was young and horses when she was older.  Thus, respondent contends that petitioners were more interested in providing horses for Amy than in making a profit.  We disagree. Petitioners started their horse activity in 1993 with Tequila Twist and Double A Son Dee Sox, neither of which is a pony.  They bought two mares in 1993, one of which was a quarter pony.

Respondent contends that this case is like Budin v. Commissioner, T.C. Memo. 1994-185 (taxpayers were more interested

in their child's horse show activity than in making a profit). We disagree. The taxpayers in that case had no experience with horses before they began their horse activity. The taxpayers' son began competing 3 years before they began their horse activity. He showed great potential as a rider the year before they started the activity.

Respondent contends that petitioners' failure to own a stallion was inconsistent with their business plan and restricted their ability to make a profit. We disagree. Petitioners did not own a stallion because that would require them to pay to acquire and maintain the stallion and to modify their facilities.

Respondent contends that petitioners' mares were not good enough to support a profitable breeding program. It was too early to tell whether respondent's speculation is correct in 1995 and 1996, the third and fourth years of petitioners' horse breeding activity.

Respondent contends that petitioners did not advertise their horse activity in a businesslike manner. We disagree. Petitioners advertised horses for sale in a local newspaper. They also showed their horses. See Engdahl v. Commissioner, 72 T.C. at 662-663, 667 ("Horse shows are the best form of advertising for American saddle-bred horses."); Golanty v. Commissioner, 72 T.C. 411, 430-431 (1979) (taxpayers' failure to show horses indicated that taxpayers were not engaged in activity

for profit), affd. 647 F.2d 170 (9th Cir. 1981).

Respondent contends that petitioners' failure to insure horses they had foaled and horses worth less than $20,000 shows that they lacked a profit objective. Respondent also contends that petitioners' failure to charge fees for all riding lessons and hauling leased horses shows they lacked a profit objective. We decline to second-guess petitioners on these points.

### d. Changing Their Operations

Boarding horses allowed petitioners to derive income from their facilities before they filled them with their own horses. Respondent concedes that petitioners' boarding operation is a change contemplated by section 1.183-2(b)(1), Income Tax Regs., but points out that petitioners' decision to board horses did not prevent losses. However, petitioners' losses would have been larger if they had not boarded horses. Petitioners also leased horses in 1995 and 1996.

### e. Conclusion

Petitioners operated their horse activity in a serious and organized manner. They considered how best to use their land, the growing interest in horses in their area, and their personal expertise with horses in deciding to start the horse activity. They kept accurate records of their horse activity's finances and the status of their horses. They improved and expanded their facilities and boarded horses while beginning to acquire quality

broodmares. They tried to keep costs as low as possible. This factor favors petitioners.

### 2. The Expertise of the Taxpayers or Their Advisers

Efforts to gain experience, a willingness to follow expert advice, and preparation for an activity by extensive study of its practices may indicate that a taxpayer has a profit motive. See sec. 1.183-2(b)(2), Income Tax Regs.

Respondent contends that petitioners did not seek or have the economic expertise necessary to operate the horse activity profitably. Respondent points out that petitioners did not show a profit from 1993 to 1996, and that none of the material that petitioners reviewed or experts with whom they talked addressed how to make a profit or minimize losses. Petitioner knew a lot about breeding, raising, training, boarding, buying, and selling of horses and the costs associated with those actions. Mr. Strickland had extensive business experience. Petitioners read books and periodicals, viewed videotapes, attended seminars, and consulted with experts. We believe that petitioners had the expertise to conduct a profitable horse activity. This factor favors petitioners.

### 3. Taxpayer's Time and Effort

The fact that a taxpayer devotes much time and effort to conducting an activity may indicate that he or she has a profit objective. See sec. 1.183-2(b)(3), Income Tax Regs.

Respondent contends that petitioner's time log for 1996 shows that she did not spend much time on the horse activity. We disagree. The time log for 1996 corroborates petitioners' and Amy Stenger's testimony about the time and effort they spent on the horse activity. This factor favors petitioners.

4. Expectation That Property Used in the Activity Would Appreciate in Value

A taxpayer may intend to make an overall profit when he or she expects appreciation in the value of assets used in the activity to exceed losses. See sec. 1.183-2(b)(4), Income Tax Regs. There is an overall profit if net earnings and appreciation exceed losses from earlier years. See Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967).

Respondent contends that petitioners have not shown that the appreciation in assets by 1996 exceed their losses. Respondent's contention improperly focuses on actual rather than expected appreciation. See sec. 1.183-2(b)(4), Income Tax Regs. Petitioners contend that they expected appreciation in the value of their horses to more than offset their net losses. The evidence upon which petitioners rely is inconclusive. This factor is neutral.

5. Taxpayer's Success in Other Activities

The fact that a taxpayer has previously and profitably engaged in similar activities may show that the taxpayer has a

profit objective.  See sec. 1.183-2(b)(5), Income Tax Regs.

Petitioners have been successful in other activities, but none that are similar to their horse activity.  This factor is neutral.

6.   Taxpayer's History of Income or Losses

A history of substantial losses may indicate that the taxpayer did not conduct the activity for profit.  See Golanty v. Commissioner, 72 T.C. at 427; sec. 1.183-2(b)(6), Income Tax Regs.  Losses during the initial stage of an activity do not necessarily indicate that it is not conducted for profit.  See Engdahl v. Commissioner, 72 T.C. at 669; sec. 1.183-2(b)(6), Income Tax Regs.  The startup phase of a horse-breeding activity may be 5 to 10 years for standardbred horses.  See Engdahl v. Commissioner, supra.  This factor is neutral because petitioners were in the third and fourth year of their activity in 1995 and 1996.

7.   Amount of Occasional Profits, If Any

The amount of any occasional profits the taxpayer earned from the activity may show that the taxpayer had a profit motive. See sec. 1.183-2(b)(7), Income Tax Regs.  Petitioners did not have a profit from 1993 to 1996.  However, this is not unreasonable during the startup years of petitioners' activity.

Losses sustained because of unforeseen or fortuitous circumstances beyond the control of the taxpayer do not indicate

that the activity was not engaged in for profit. See sec. 1.183-2(b)(6), Income Tax Regs. Petitioners' mare, Miss Magical Colors, and her foal died in 1994. Respondent contends that their deaths were insignificant. We disagree. Miss Magical Colors' death represented a loss of 25 percent of petitioners' breeding capability. This factor is neutral.

8. Financial Status of the Taxpayer

The receipt of a substantial amount of income from sources other than the activity may indicate that the taxpayer does not intend to conduct the activity for profit. See sec. 1.183-2(b)(8), Income Tax Regs. Respondent contends that this factor favors respondent because petitioners had a substantial amount of income from sources other than the horse activity in the years in issue. We disagree.

Petitioners' nonfarm income decreased from $218,949 in 1995 to $135,594 in 1996. Petitioner retired in 1993, and Mr. Strickland was scheduled to retire in 1998. Petitioners believed that their annual income from sources other than their horse activity would decrease. This suggests they had no long-term need to shelter income after the startup phase. This factor is neutral.

9. Elements of Personal Pleasure

The presence of recreational or personal motives in conducting an activity may indicate that the taxpayer is not

conducting the activity for profit. See sec. 1.183-2(b)(9), Income Tax Regs. However, a taxpayer's enjoyment of an activity does not show that the taxpayer lacks a profit objective if the activity is conducted for profit as shown by other factors. See Jackson v. Commissioner, 59 T.C. 312, 317 (1972); sec. 1.183-2(b)(9), Income Tax Regs. Petitioners enjoyed breeding and showing horses, but we doubt that petitioners' motive for boarding and leasing their horses to others was to derive personal pleasure. This factor is neutral.

C.    Conclusion

Petitioners operated their horse activity in a business-like manner. They had the expertise to conduct a profitable horse activity. They spent a substantial amount time on their horse activity, including taking care of other people's horses. We conclude that petitioners engaged in their horse activity for profit in 1995 and 1996.

To reflect the foregoing,

Decision will be entered

for petitioners.