Joan F. (Walton) Farris v. Commissioner. Richard W. Farris and Joan F. Farris v. Commissioner.
Farris v. Commissioner
Docket Nos. 6711-70, 6712-70.
United States Tax Court
T.C. Memo 1972-165; 1972 Tax Ct. Memo LEXIS 93; 31 T.C.M. (CCH) 821; T.C.M. (RIA) 72165; August 3, 1972
Herman L. Trautman and Harry L. Riggs, Nashville, Tenn., for the petitioners. Jack D. Yarbrough, for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in the income tax of petitioners in these consolidated cases as follow: Taxable
Petitioner
Year
Deficiency
Joan F. (Walton) Farris
1965
$25,405.00
Docket No. 6711-70
1966
29,150.00
Richard W. Farris and Joan F. Farris
1967
18,680.00
Docket No. 6712-70
1968
26,209.00
*94 The parties will agree to certain adjustments and we are asked to determine whether the American saddle bred horse raising operations of petitioner Joan Farris constituted a business enterprise or whether these activities were only the petitioner's hobby. It is agreed by the parties that the resolution of that issue will dispose of the following items of the deficiencies: I. Whether losses incurred by Joan Farris (hereafter referred to as "petitioner") in her horse operation are deductible from her gross income; the losses referred to are those claimed in the income tax returns for the years in issue and are as follows: Year
Loss
1965
$43,777
1966
41,898
1967
35,164
1968
42,860
II. Whether unclaimed expenses of the horse operation for the years 1966, 1967 and 1968 are deductible so as to entitle petitioner to a refund for overpayment of tax for these years. Petitioner failed to claim deductions for these expenses solely due to her mistaken belief that a prior settlement with the Internal Revenue Service pursuant to which 20 percent of the expenses of the horse operation were disallowed for the taxable years 1962, 1963 and 1964 was also binding in taxable *95 years beginning after 1965. The amounts of the claimed overpayments are as follow: Disputed
Year
Overpayment
1966
$8,913
1967
8,979
1968
8,399
III. Whether the amount of $6,813.02, being the outstanding balance in 1966 of a loan owed to petitioner by one Dawn Atlas, is deductible in that year as a business bad debt or as a nonbusiness bad 822 debt under the pertinent provisions of section 166, I.R.C. 1954. [1]IV. Whether petitioner is entitled to a loss on the sale of a broodmare for the year 1965 in the amount of $27. Findings of Fact Some of the facts are stipulated and are incorporated with the joint exhibits by this reference. The petitioners Richard W. and Joan F. Farris were married in 1967. Joan F. Farris was formerly married to Mark Walton who died on June 20, 1960. Joan and Mark Walton had three daughters, Alison, Andrea, and Barbe. Richard W. Farris is involved in this case only by virtue of having filed joint returns with Joan F. Farris for the years 1967 and 1968; Joan F. Farris, under the name Joan F. Walton, filed individual federal *96 income tax returns for 1965 and 1966. In all of these taxable years the returns were filed with the district director of internal revenue at Indianapolis, Indiana, or with the Regional Service Center at Covington, Kentucky. At the time of filing the petitions herein Richard W. Farris and Joan Farris resided in La Porte in northern Indiana. Petitioner has lived in La Porte all her life, and she was reared in the home adjacent to her present residence. Petitioner became interested in saddle horses as a child because her father kept good horses for transportation purposes before the advent of the automobile. He maintained two or three good saddle horses for family use. In 1955 petitioner acquired a horse by gift, and during that year she and two of her daughters began taking riding lessons from Miss Dawn Atlas, a young horsewoman and trainer who operated stables under the name Fantasy Farm in Michigan City, Indiana, 15 miles from La Porte. The decision to engage in the activities of horse breeding, training, exhibiting and selling American saddle bred horses was made in 1957. Petitioner purchased two mares shortly thereafter, and began keeping books and records, although petitioner's *97 accounting methods did not become systematic in her own estimation until after 1965. The books and records were maintained in La Porte throughout the years, even as the physical location of the operation moved further away. Petitioner engaged the accounting firm Lybrand, Ross Bros. & Montgomery in Chicago to assist her in this and other matters, including preparation of her income tax returns. The books and records she keeps consist of a check register, a journal, deposit slips, cancelled checks and bank statements, and a well-organized historical summary and profile of her horse operation which petitioner calls a "recapitulation journal." The petitioner maintained two checking accounts upon which she wrote both personal checks and checks connected with the horse operation. One account was used primarily for paying small bills, and the other, into which certain trust income was deposited and which was maintained at the First National Bank of Chicago, was reserved for paying larger bills, such as charges made by horse trainers. Starting in 1959 petitioner began operating under the professional name "Peppermint Valley Stables, La Porte, Indiana." However the mode of operation has always *98 been as it was from the beginning at Fantasy Farm, that is, with petitioner's herd stabled at the premises of a trainer engaged by petitioner to give daily attention to the care and raising of the horses and to act as an adviser and agent for petitioner with respect to purchasing additions to and selling stock out of the herd. Petitioner kept her fledgling horse operation at Fantasy Farm until 1962. While the expertise of Miss Atlas was adequate during the early years, petitioner gradually lost confidence in her judgment after petitioner, in endeavoring to increase her inventory of show horses, made certain purchases on Miss Atlas' recommendation that later proved unwise. Miss Atlas' poor relationship with her mother, with whom she lived at Fantasy Farm, further impaired her effectiveness in the horse breeding operation. At one point in 1961 Miss Atlas moved her stables to a farm near Detroit, on rather short notice to petitioner, in order to live away from home. Petitioner allowed her herd to be transported, but after a sojourn of about 8 weeks in Michigan, petitioner prevailed on her trainer to return to Indiana. Part of the inducement for returning was a loan of $7,500 petitioner *99 made to Miss Atlas to help her build a small dwelling house at Fantasy Farm where she could live separately from her 823 mother. In 1966 the balance due on the note was $6,813.02, which was uncollectible. In July 1962 petitioner relocated her Peppermint Valley herd to Crabtree Stables of Simpsonville, Kentucky, about 200 miles from La Porte, and placed the responsibilities of boarding, training, breeding, purchasing and selling her horses in the expert hands of Charles Crabtree, a highly reputed and experienced trainer. [2] Petitioner patronized Crabtree Stables until October 1971. Each of her three daughters received equitation lessons there also. The facilities were extensive, and during the nine year period petitioner's herd grew to its current proportions; Crabtree was instrumental in the acquisition of petitioner's top stallion, Oman's Desdemona Denmark, and two nationally reputed brood mares, Dixie Duchess and Supreme Sensation. Petitioner commenced the breeding of her own colts and began to derive income from stud fees generated by the stallion's services. However, uncontrollable boarding and training costs and the disadvantage of a nonexclusive agency with Crabtree, who *100 handled horses for his own account as well as for several other clients, led petitioner to relocate to the Fritz Jordan Stables, Franklin, Tennesse also many miles from La Porte. Jordan agreed with petitioner that he would keep no animals of his own for sale while he served as the trainer of her operation. The Fritz Jordan Stables are less extensive than the Crabtree Stables. However, the former has 40 pasture acres, as well as a training barn with 33 stalls, a tack room, an inside work ring, an outdoor work ring, straight-of-way and paddocks. Petitioner's proper activities are promoting the reputation of Peppermint Valley Stables through exhibitions and shows in which she and her daughters have ridden horses and through advertising her horses in the national trade journals Saddle and Bridle and Horse World, studying developments in the saddle bred horse industry, and financial management. Petitioner devotes an average of 35 hours per week to these duties. Her horses have been exhibited at shows in the Midwest that attract prospective buyers from throughout the nation. Personal demonstration of the animals at these *101 events by petitioner and her daughters has enhanced the attractiveness to prospective purchasers of the horses exhibited. Each of the daughters received lessons in the art of riding from Crabtree Stables at no cost in addition to the price of training the horses. When petitioner decided to begin horse breeding in 1957 she elected to build up a herd gradually by making a few purchases and breeding them. It was possible for her to buy outright a sizeable herd consisting of breeding horses and show horses. She could not have purchased a farm or erected her own stables at that time, however. By taking the gradual approach petitioner necessarily lengthened the time it would take to bring the herd to its desired size. There was little progress in this respect for example until 1961, since neither of the first two mares petitioner owned were successful at breeding before then. Petitioner has now developed the herd to a point near her original goal. The following chart shows the progress of the herd between 1957 and 1971: 1957
1958
1959
1960
1961
1962
1963
1964
1965
Broodmares
1
2
3
4
5
7
10
9
8
Breeding stallions
Horses held for sale Purchased
1
0
3
4
5
6
6
Bred
1
3
4
3
7
Total held for sale
1
0
4
7
9
9
13
Total, all horses
1
2
4
4
9
14
19
18
21
1966
1967
1968
1969
1970
1971
Broodmares
8
9
11
9
7
7
Breeding stallions
1
1
1
2
2
Horses held for sale Purchased
4
3
4
5
4
4
Bred
11
15
13
15
9
7
Total held for sale
15
18
17
20
13
11
Total, all horses
23
28
29
30
22
20 *102 824 Part of the inventory of horses held for sale, as the foregoing chart indicates, consists of colts that were purchased and part consists of horses that were bred in petitioner's operation. From 1965 through 1970 petitioner sold for an overall loss of $53,051.06, 17 purchased horses most of which were inventory and the rest of which would be classifiable as section 1231 property if the horse operation constituted a business. From 1964 through 1971, the total proceeds of the sale of 25 raised colts, likewise consisting of mixed inventory property and section 1231 property (which necessarily had a basis of zero) if petitioner's operation constituted a business, equalled $61,223.36. The cost of raising a colt to adulthood, which requires three years, currently averages $5,000; this cost, which includes the imputed value of the herd sire's services, has doubled since 1963. The cost of maintaining a colt that has reached its third year is roughly $2,500 per year. Only two of the purchased horses sold were sold at a gain. One of the two, the mare Sheltered Shirley, was sold in 1968 at a gain of $2,750; this horse was purchased in 1964 on the advice of Crabtree Stables. In each taxable *103 year from 1959 through 1970 petitioner sustained losses on her horse operation, which were reported on Schedules D and F of Form 1040, as follow: Capital
Net Loss
Gain
Total
Year
Sch. F
(or loss)
Loss
1959
$ 8,721
$ (600)
$ 9,321
1960
11,759
600
11,159
1961
23,621
(425)
24,046
1962
33,773
(13,36 0)
47,133
1963
34,963
(12,011)
46,974
1964
42,057
82
41,975
1965
43,477
(54)
43,531
1966
41,898
2,150
39,748
1967
35,164
35,164
1968
42,860
42,860
1969
21,982
(3,703)
25,685
1970 43,650
(1,080)
44,730
Total
$383,925
[28,401)
$412,326
Gross income from the operation advanced from less than $1,000 in 1959 to $35,859, and then fell sharply in 1970 to $11,062. However, gross income will be augmented in subsequent years if the demand for saddle bred horses continues to expand as it did in the 1960's and if petitioner's reputation for fine quality horse breeding and raising also continues. Much of the strength of this reputation depends on the bloodlines of petitioner's breeding stock. Her prize stallion, Oman's Desdemona Denmark, purchased in 1967 at a cost of $20,000, has advanced in the Saddle and Bridle *104 annual national stallion ratings from 16th place in 1966 to 8th place in 1969. The stallion's increasing popularity has brought increases in revenues from stud fees each year; after the unsuccessful years 1967 and 1968, the income derived from contracting out the services of the horse to others has grown to $6,250; the original fee of $500 has been raised to $750 and may be expected to be raised again to $1,000. At least 22 mares have been booked to the stallion under outside breeding contracts for 1972, and thus at least $16,500 to $22,000 will be realized in that year from stud fees alone. As a proven stud, he can eventually be expected to service 30-50 mares annually. Ownership of the prized stallion also brings savings since petitioner will not have to pay for the services of an outside stallion for her own mares. The reputation of the breeding stock also carries over to the offspring. In 1968 Peppermint Valley Stables sold the horse Glenview's Radiance, the get of Oman's Desdemona Denmark and one of the stable's best mares, Dixie Duchess, for $60,000. In addition to the herd, other assets of petitioner's horse operation worth over $14,000 are equipment including a van and *105 tractor, a fine harness show buggy, a set of fine show harnesses, eight tail sets and bridles, three saddles, and other miscellaneous items. The value of the herd alone in 1971 was in excess of $200,000. Petitioner customarily kept one to three horses for her personal use and that of her daughters in La Porte, Indiana. Ultimate Findings Petitioner had a bona fide intention of making a profit from her horse operation. She was engaged in the business of horse breeding and raising during the taxable years at issue. Opinion A bona fide expectation of making a profit is necessary and sufficient condition to entitle the petitioner to the various business deductions claimed by her pursuant to Part IV of subchapter B or section 212, I.R.C. 1954. Margit Sigray Bessenyey, 45 T.C. 261, 273 (1965), affd. 379 F. 2d 252 (C.A. 825 2, 1967), cert. denied 389 U.S. 931. There is no argument in this case that petitioners' intentions changed at any time from the commencement of the horse operation in 1957 to the present time, and thus if she ever had the requisite profit-making motive she had it at all relevant times. We have listened to the testimony *106 of the petitioner Joan Farris and have observed her demeanor, and we are convinced that she indeed has entertained a bona fide expectation of making a profit. Of course, we are mindful that we should not rely on the petitioner's self-serving testimony alone. Farish v. Commissioner, 103 F. 2d 63 (C.A. 5, 1939). However, the considerations that corroborate petitioner's professed profit-making motive predominate. It has been held that the ultimate issue in cases of this nature is one for the trier of fact. Morton v. Commissioner, 174 F. 2d 302, 303 (C.A. 2, 1949). Theodore Sabelis, 37 T.C. 1058, 1062 (1962), acq. 1962-2 C.B. 5. We think the dispositive factors in this case are the outlook for petitioner's horse operation, its scale, the fact that petitioner maintains adequate books and records, and the fact that she has engaged professional trainers to care for the herd. It is sometimes said that even an unreasonable though sincere expectation of making a profit will suffice. In this case, however, petitioner could entertain a reasonable expectation of showing a profit within the next few years. Based on the evidence in this *107 case, there is a growing demand for saddle bred horses and particularly for horses raised at Peppermint Valley Stables. Petitioner's stock of inventory colts has been increasingly composed of offspring of Peppermint Valley sires and dams, the cost of which may generally be expected to be less than that of comparable purchased animals. Petitioner can also expect very soon to derive substantial revenue from stud fees earned by her prize stallion and her backup stallion, while at the same time conserving the funds that would be spent if petitioner were herself required to enter the market for the services of an outside stallion. The scale of petitioner's horse operation is such that it would supply many times over the merely personal satisfaction she derives from owning and raising fine horses. The herd has been stabled many miles from petitioner's home in states other than Indiana since 1962; petitioner keeps the books and studies the saddle bred horse industry at her home in La Porte, Indiana, but apparently has little control over the daily care of the herd. We think any pleasure that may accompany managing a herd of such size and involving so considerable a financial commitment *108 must be only the satisfaction one derives from operating a business. Wilson v. Eisner, 282 Fed. 38 (C.A. 2, 1922). By contrast, the one or two horses she keeps at her home admittedly are purely for personal use. The fact that petitioner keeps adequate books and records and seeks the assistance of her accountants is also a strong indication of the presence of a profit-making motive. Norton L. Smith, 9 T.C. 1150, 1155 (1947). We have also given weight to the employment of professional help in running the horse operation. Morris A. Stoltzfus, supra. The Commissioner invites us to conclude that petitioner had no profit-making intention from the fact that since the beginning in 1957 the horse operation has experienced an uniniterrupted series of loss years although this Court has noticed that a fledgling saddle bred horse business normally will show a profit no later than its tenth but perhaps as early as its fifth year. Morris A. Stoltzfus, supra. Even though petitioner's first profitable year may be overdue by this standard, we think that is accounted for by the unsuccessful breeding attempts in the first four years after 1957. *109 It is, of course, feasible for petitioner to enter the industry profitably in the gradual manner she chose. The Commissioner has developed the facts concerning petitioner's substantial sources of income which make it possible for her to absorb the losses from the horse operation year after year. Although the knowledge that she would not have to look to the operation for a livelihood may have been an inducement to petitioner for entering the industry, we cannot say on the facts of this case that her intentions were less business-like for that reason. We are disinclined therefore to draw the inference from the presence of losses in every year that petitioner was indifferent to making a profit; "a long series of losses without more does not transpose the enterprise from a business into a hobby." Patterson v. United States, 29 A.F.T.R. 2d 72-1181, 1187 (Ct. Cls. 1972). Decisions will be entered under Rule 50. 826 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.↩
2. See Morris A. Stoltzfus, T.C. Memo. 1970-337↩.