# United States Tax Court

T.C. Memo. 2026-47

KEITH SCHUMACHER AND RHONDA SCHUMACHER,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 4276-23.                                Filed June 9, 2026.

————

*Howard N. Kaplan*, for petitioners.

*Rae L. Ensor*, *Christina L. Holland*, and *Joline M. Wang*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COPELAND, *Judge*: Petitioners, Keith and Rhonda Schumacher, are longtime hippophiles. Horses have been an important part of each of their lives from an early age. Over the years they have owned horses, cared for them, and competed in equestrian events. In 2001 the Schumachers began operating Schumacher Quarter Horses (SQH),[1] which bred show horses. The Commissioner examined the Schumachers' Forms 1040, U.S. Individual Income Tax Return, for the 2017–19 tax years (years at issue) and determined the following deficiencies and accuracy-related penalties:

[1] SQH is operated as a sole proprietorship.

[*2]

| Year | Deficiency | I.R.C. § 6662(a)[2] Penalty |
|---|---|---|
| 2017 | $62,266[3] | $11,458 |
| 2018 | 61,466 | 11,697 |
| 2019[4] | 67,447 | 10,365 |

The deficiencies are largely due to the Commissioner's determination that the Schumachers' horse breeding and training activities were not conducted with a profit motive as required by section 183 and that they are therefore not entitled to business expense deductions. The Commissioner made various other income adjustments, including moving income from horse activities reported on Schedules F, Profit or Loss From Farming, to other sections of their returns, and reducing or disallowing certain itemized deductions.

In the First Stipulation of Settled Issues the parties conceded certain adjustments, including that the Schumachers (1) received flowthrough income from their ownership interest in Northeast Nebraska Veterinary Services, PC (Northeast),[5] in addition to the amounts reported on their returns of $12,713 and $11,060 for their 2017 and 2018 tax years, respectively, which were reportable on Schedule E, Supplemental Income and Loss, for each year; (2) received patronage dividends of $18, $10,133, and $20 for 2017, 2018, and 2019, respectively, all of which were reported on their Schedules F but should have been included on their Schedule C, Profit or Loss From Business,

---

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[3] Dollar amounts in this Opinion are rounded to the nearest dollar.

[4] The Notice of Deficiency lists tax years 2017, 2018, and 2018. A review of the attachments makes clear that the duplicate reference to 2018 is a scrivener's error and that the intended year was 2019. *See Sather v. Commissioner*, 251 F.3d 1168, 1176–77 (8th Cir. 2001), *aff'g in part, rev'g in part* T.C. Memo. 1999-309. Moreover, the Schumachers do not claim to have been misled by this error; their Petition contests determinations for each of 2017, 2018, and 2019. Consequently, the Notice of Deficiency was sufficient to put a reasonable taxpayer on notice of the deficiency determination as to tax year 2019; and even if it was ambiguous, the fact that the Schumachers were not misled confirms that the Commissioner made a determination concerning tax year 2019 which we have jurisdiction to redetermine in this case. *See Dees v. Commissioner*, 148 T.C. 1, 5–7 (2017).

[5] Northeast is an electing small business corporation (S corporation). *See* I.R.C. § 1361.

[*3] for each year; (3) received income related to their car-leasing activity of $5,136, $5,136, and $12,000 for their 2017, 2018, and 2019 tax years, respectively, which was reportable on their Schedule C for each year; and (4) are entitled to deduct the following Schedule C expenses related to their car-leasing activity:

| Tax Year | Repairs and Maintenance | Depreciation | Insurance (Excluding Health) |
|---|---|---|---|
| 2017 | $266 | $2,935 | $432 |
| 2018 | 115 | 4,145 | 491 |
| 2019 | 1,185 | 7,917 | 1,178 |

The issues remaining for decision are whether the Schumachers (1) operated SQH for profit within the meaning of section 183 and, if not, (2) are liable for section 6662(a) accuracy-related penalties.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. By this reference we incorporate the parties' First Stipulation of Facts and accompanying Supplements and Exhibits. The Schumachers resided in Nebraska when they timely filed their Petition.

I.    *Petitioners*

During the years at issue the Schumachers lived on a 50-acre parcel of land they had acquired in 1994. The couple owned horses for many years, culminating in an interest in breeding and raising horses. In 2001 they established SQH and purchased a weanling filly for future breeding. At that time, the filly's genetics were not their primary motivator; rather, they selected her for her overall appearance and color. The Schumachers successfully raised several foals from this filly and eventually purchased additional mares for breeding. During this initial phase they paid third parties for breeding stallions.

In 2006 the Schumachers purchased a stallion of their own, which was chosen for his pedigree. He was a descendant of American Quarter Horse Association (AQHA) champions on both his sire's and dam's sides. The Schumachers showed the stallion for four years in pursuit of an AQHA championship but were unable to secure the necessary halter

[*4] points.[6]    Nonetheless, the stallion accumulated a substantial number of AQHA performance points, sired a great many foals both on and off the Schumachers' farm, and was ultimately sold to a buyer in Brazil.

In or about 2011 or 2012 the Schumachers determined that they needed to upgrade the quality of their mares and therefore purchased a broodmare descended from successful show horses.  The broodmare gave birth to at least one highly successful show horse: a mare who was a two-time reserve world champion and a three-time top ten contender at the AQHA World Championship Show in Oklahoma City.  Schumacher horses have been highly successful at AQHA World Championship Shows, and their horses have earned either second or third place on four separate occasions.  At some point, the Schumachers considered transitioning away from AQHA competitions to alternatives such as the Howard Pitzer Invitational or the Riata Buckle.

In or around 2016 the Schumachers built an indoor horse-riding arena, also known as a hoop barn, on their property at a cost of approximately $230,000, which enabled them to comfortably ride year round.  SQH's horse inventory was between 10 and 25 horses during the years at issue.  In addition to breeding and raising horses, the Schumachers farmed alfalfa for use as horse feed on 17 of their 50 acres and sold any leftover cuttings.  It was common for the Schumacher family, including children, to ride the horses together.  SQH was staffed and operated exclusively by Keith Schumacher, Rhonda Schumacher, and their son, T.S.,[7] during the years at issue.

### A.    *Keith Schumacher*

Dr. Schumacher was around horses from a young age.  Except for the years he was in veterinary school, Dr. Schumacher has owned horses his entire adult life.  He is a licensed veterinarian and has practiced veterinary medicine since 1986.  He is a shareholder in a veterinarian practice, Northeast.  During the years at issue Dr. Schumacher worked at Northeast full time, which usually entailed 60 hours or more each week, including on-call time.  It is and was a demanding job; during the years at issue he regularly responded to calls at night, on the weekends, and during holidays.  Dr. Schumacher had a general understanding of

---

[6] To win an AQHA championship, a horse must earn a certain number of points in two categories: performance (performance points) and appearance (halter points).

[7] We refer to minor children by their initials.  *See* Rule 27(a)(3).

[*5] Northeast's financial records, and he had a credit card that he used exclusively for business expenses related to the veterinary practice.

In 2019 Dr. Schumacher enrolled in the 12-week Clinton Anderson Method Ambassador horse training course (Clinton course). In the Clinton course Dr. Schumacher learned how to train his horses to walk, trot, and lope in a straight line, to lead, and not to buck. He also learned about improving horse safety more broadly. Dr. Schumacher spent two to four hours a day with SQH's horses, though the precise amount varied depending on the season and how busy he was with his veterinary practice. His activities included training, catching, grooming, and saddling SQH's horses. He spent most of this time on indoor activities, with the remainder spent on outdoor activities, primarily trail riding. In addition he regularly discussed horse breeding with fellow AQHA members. Dr. Schumacher derives a tremendous amount of pleasure from his horse-related activities and has a passion for competing in horse shows.

B. *Rhonda Schumacher*

Mrs. Schumacher was also exposed to horses from a young age. In the past she competed in barrel racing, roping, and showing events. In or around 2007 she began her career working full time in the field of education and continued in that role during the years at issue. Her typical work hours were from 8 a.m. to 4 p.m., subject to school calendar breaks. Mrs. Schumacher was not involved in accounting or recordkeeping in that role.

During the years at issue, in addition to working in the education field, Mrs. Schumacher competed in barrel racing. She likewise trained horses, though the record is unclear as to whether this was in a general sense or specifically for barrel racing. It was primarily her responsibility to feed SQH's horses, and she often took them trail riding. During the school year she worked with the horses each morning before school and again in the afternoon after school. During the summer months she sometimes worked with the horses from the early morning hours until dusk. She gained a great deal of satisfaction working with and racing horses.

C. *T.S.*

T.S., then a high school student, helped his parents take care of SQH's horses during the years at issue. During the summers T.S. had a full-time job outside the family farm. He did not work outside the

[*6] family farm during the school year. In addition to his academic schedule, T.S. played football in the fall and wrestled in the winter, with practices every weekday and football games and wrestling meets on the weekends. His combined sports seasons lasted from August until March.

T.S. was assigned at least 15 to 20 minutes of horse-related chores by his parents each day during the years at issue. His parents considered some of the horses to be his, and he was responsible for feeding and riding those horses. T.S. did not train horses in the years at issue.

## II. *SQH's Bank Accounts and Records*

The Schumachers had both a joint personal checking account and a separate SQH business account at Homestead Bank during the years at issue. The couple routinely replenished the depleted SQH business account with personal funds, and their personal checking account served as its overdraft protection. The Schumachers frequently paid horse-related expenses from their personal checking account and subsequently reported those expenses on their Schedules F during the years at issue.

To the extent the Schumachers tracked their horse-related income and expenses, they did so by referring to their bank statements in the aggregate rather than reviewing individual expenses. They likewise did not track expenses for each individual horse. The Schumachers kept some handwritten notes and receipts related to SQH during the years at issue. Both Dr. and Mrs. Schumacher contributed to the handwritten notes. Dr. Schumacher was responsible for making estimated federal tax payments, and Mrs. Schumacher was responsible for paying SQH's other bills.

## III. *The Schumachers' Returns*

The Schumachers' Forms 1040 for 2017, 2018, and 2019 reported wage income of $118,028, $130,182, and $114,660, respectively. Their 2017 and 2018 Schedules E also reported nonpassive passthrough income from Northeast of $301,993 and $279,499, respectively. The record contains no Schedule E for the Schumachers' 2019 tax year. However, their Schedule 1, Additional Income and Adjustments to Income, for that year reflects income from "[r]ental real estate, royalties, partnerships, S corporations, trusts, etc." of $354,877. Their Schedules F reported net farm losses of $161,321, $165,149, and $129,908 for their 2017, 2018, and 2019 tax years, respectively. The

**[\*7]** losses are consistent with SQH's history of Schedule F losses, as shown in the following table.

| Year | Gross Income | Operating Expenses | Net Schedule F Income (Loss) |
|---|---|---|---|
| 2010 | $6,967 | $216,109 | ($209,142) |
| 2011 | 58,954 | 269,102 | (210,148) |
| 2012 | 58,871 | 157,004 | (98,133) |
| 2013 | 3,500 | 104,084 | (100,584) |
| 2014 | 48,963 | 99,991 | (51,028) |
| 2015 | 60,800 | 213,182 | (152,382) |
| 2016 | 28,372 | 187,977 | (159,605) |
| 2017 | 18,138 | 179,459 | (161,321) |
| 2018 | 53,973 | 219,122 | (165,149) |
| 2019 | 98,550 | 228,458 | (129,908) |

For each year at issue the Schumachers' Schedule F losses partially offset the reported passthrough income, wages, or other income, yielding final tax bills of $85,811, $40,046, and $60,829, respectively.

Robert Cruise, an accountant and enrolled agent, prepared the Schumachers' tax returns for approximately 20 years, including the years at issue. He was also the tax accountant for Northeast, handling its bookkeeping and tax return preparation.

Mr. Cruise relied exclusively on the Schumachers' handwritten records and statements made by Dr. Schumacher, along with any receipts provided. He was aware that the Schumachers neither used business recordkeeping software nor maintained a ledger of expenses. Mr. Cruise never told the Schumachers that SQH's records were inadequate. Any questions related to the Schumachers' returns were directed to Dr. Schumacher by Mr. Cruise, and Dr. Schumacher always replied in a timely manner. Dr. Schumacher did not withhold any information from Mr. Cruise and relied on him for analysis of the information provided.

During each of the years at issue the Schumachers discussed section 183 compliance with Mr. Cruise and relied on his expertise in determining whether SQH was a hobby or a business. Mr. Cruise never suggested that the Schumachers create a business plan for SQH, nor did

[*8] they ever create one. Mr. Cruise advised the Schumachers that their horse-related activities satisfied section 183 even though SQH had never had a profitable year since its founding.

In or about January 2020 the Internal Revenue Service (IRS) initiated an examination for the Schumachers' 2017–19 tax years, assigning Revenue Agent Jeane Quinne (RA Quinne) to their case. Mr. Cruise assisted the Schumachers during the examination. The Schumachers instructed Mr. Cruise to provide RA Quinne with all their SQH records for the years at issue. Mr. Cruise or his employees prepared for RA Quinne spreadsheets and charts characterizing and summarizing SQH's expenses from various receipts, invoices, and SQH business account bank statements provided to him by the Schumachers.

On October 16, 2020, as the examination neared completion, RA Quinne prepared a penalty approval form. She recommended assertion of section 6662 accuracy-related penalties against the Schumachers for their 2017–19 tax years. Robert Mahon, a group manager and the immediate supervisor of RA Quinne, approved her initial determination of the accuracy-related penalties on October 16, 2020. On January 5, 2021, RA Quinne sent the Schumachers Letter 4121, Agreed Examination Report Transmittal. This Letter 4121 was the first formal communication to the Schumachers that the IRS intended to assert penalties. On December 8, 2022, the Commissioner issued a Notice of Deficiency to the Schumachers, who timely filed their Petition.

OPINION

I.    *Burden of Proof*

The Commissioner's determination in a Notice of Deficiency is generally presumed correct, and the taxpayer bears the burden of proving otherwise. Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Under section 7491(a), the burden of proof may shift to the Commissioner if the taxpayer introduces credible evidence with respect to factual issues relevant to ascertaining his or her liability, and complied with all substantiation requirements in the Code, maintained all records required by the Code, and cooperated with reasonable requests by the Commissioner for information, documents, and meetings. The Schumachers do not contend that they have met the requirements of section 7491 for shifting the burden of proof. *See* Rule 142(a)(2). Thus, the burden of proof for all factual issues remains with the Schumachers.

**[*9]** II.     *Section 183*

Generally, under sections 162(a) and 212(1), a taxpayer may deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business, or for the production or collection of income. Expenses in connection with activities not engaged in for profit, such as activities carried on primarily as a hobby, for sport, or for recreation are not deductible, except to the extent allowable under section 183(b), which limits deductible expenses from activities not engaged in for profit to the amount of gross income derived from that activity. In determining whether an activity was engaged in for profit, a safe harbor in section 183(d) relating to horses allows an activity consisting in major part of breeding, training, showing, or racing horses to be presumed engaged in for profit if it produces gross income exceeding deductions in at least two of the last seven consecutive years ending with the taxable year, unless the Commissioner establishes otherwise. SQH does not clear the hurdle for this presumption as it has not been profitable since its inception in 2001. Consequently, we must inquire further.

In deciding whether the Schumachers operated SQH for profit, we consider the following nine factors: (1) the manner in which they carried on the activity; (2) their expertise or that of their advisers; (3) the time and effort they expended in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) their success in carrying on other similar or dissimilar activities; (6) their history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which were earned; (8) their financial status; and (9) whether elements of personal pleasure or recreation were involved. *See* Treas. Reg. § 1.183-2(b). No single factor controls. *See Dunn v. Commissioner*, 70 T.C. 715, 720 (1978), *aff'd*, 615 F.2d 578 (2d Cir. 1980); Treas. Reg. § 1.183-2(b). The Schumachers' expectation of profit during the years at issue need not have been reasonable, but it must have been a good faith expectation. *See Engdahl v. Commissioner*, 72 T.C. 659, 666 (1979). While the record contains information about events that occurred after 2019, we do not rope them in because they do not show whether the Schumachers had a profit motive during the years at issue. *See Strickland v. Commissioner*, T.C. Memo. 2000-309, 80 T.C.M. (CCH) 451, 455.

**[\*10]** III.    *Applying the Factors*

    A.    *Manner in Which the Schumachers Conducted the Activity*

Carrying on an activity in a businesslike manner indicates a profit motive. Treas. Reg. § 1.183-2(b)(1). Maintaining complete and accurate books and records, conducting the activity in a manner substantially like comparable businesses which are profitable, and making changes in operations to improve profitability suggest that a taxpayer conducted an activity for profit. *See Engdahl*, 72 T.C. at 666–67; Treas. Reg. § 1.183-2(b)(1).

The Schumachers failed to keep complete and accurate records. Though they kept handwritten notes and some receipts, they did so for tax reporting, and not profit-making, purposes. *See Judah v. Commissioner*, T.C. Memo. 2015-243, at \*34 (explaining that books and records kept for reducing expenses, increasing profits, and evaluating performance are indicative of a profit motive). In order to have their tax returns prepared, the Schumachers simply provided their notes and receipts to Mr. Cruise, relying on him for any analysis or questions. The Schumachers contend that they profited from their sale of a stallion to a buyer in Brazil. We question the accuracy of their contention considering that they kept little to no record of direct or indirect per-horse expenses.

Although the Schumachers maintained a separate checking account for SQH, in practice the SQH account functioned as an extension of their personal checking account. Many horse-related expenses were paid from their personal checking account. When the SQH account ran dry, the Schumachers ponied up to replenish it from their personal checking account. These practices are inconsistent with maintaining accurate books and records. It is also telling that Mr. Cruise relied heavily on the Schumachers' handwritten notes and statements by Dr. Schumacher rather than SQH business account bank statements when preparing their returns.

The Schumachers acknowledge that they had no business plan. A written financial plan or budget is not required for a horse farm if the business plan is evidenced by a taxpayer's actions. *Phillips v. Commissioner*, T.C. Memo. 1997-128, 73 T.C.M. (CCH) 2296, 2300. Here, it is undisputed that the Schumachers had no written business plan, and we cannot say that the record supports the existence of an unwritten one.

**[\*11]** The Schumachers contend that they regularly changed SQH's operations with the goal of profitability. The evidence does not bear this out. Dr. Schumacher's testimony regarding changes in breeding and training strategies was unconvincing to the extent he attributed those changes to a profit motive. As the Schumachers implemented the changes, they experienced substantial success in AQHA competitions but saw no correlative increase in profitability. There is no indication that they attempted to reduce their expenses in prior years or during the years at issue. On the basis of the record before us, we cannot say that the Schumachers' breeding and training decisions were driven by a profit motive rather than a desire to succeed in horse competitions.

SQH was not carried on in a businesslike manner consistent with an activity engaged in for profit. This factor favors the Commissioner.

B. *The Schumachers' Expertise*

Efforts to gain experience, a willingness to follow expert advice, and preparation for an activity by extensive study of its practices may indicate that a taxpayer has a profit motive. *See* Treas. Reg. § 1.183-2(b)(2). Both Dr. and Mrs. Schumacher had experience training horses before establishing SQH, and they continued to learn more about horse training and breeding. Dr. Schumacher completed the Clinton course to further his horse training bona fides. In addition, Dr. Schumacher studied horse breeding informally through discussions with others at AQHA events. This factor favors the Schumachers.

C. *The Schumachers' Time and Effort*

The taxpayer's devotion of much of his or her personal time and effort to carrying on an activity may indicate a profit motive, particularly if the activity does not involve substantial personal or recreational enjoyment. *See id.* subpara. (3). The fact that a taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on the activity. *Id.* Despite their demanding professional and family obligations, the Schumachers still devoted substantial time to SQH. Dr. Schumacher spent two to four hours each day training and caring for the horses, while Mrs. Schumacher devoted substantially more time. They also had T.S. assist with daily chores, though only for 15 to 20 minutes per day, during the years at issue. Their construction of the hoop barn supports the Schumachers' contention that they performed these activities

**[\*12]** consistently throughout the year. On balance, this factor favors the Schumachers.

D. *Expectation That Property Used in the Activity Would Appreciate in Value*

A taxpayer may intend to make an overall profit when he or she expects appreciation in the value of assets used in the activity to exceed losses. *See id.* subpara. (4). There is an overall profit if net earnings and appreciation exceed losses from earlier years. *See Bessenyey v. Commissioner*, 45 T.C. 261, 274 (1965), *aff'd*, 379 F.2d 252 (2d Cir. 1967). Other than a headcount estimate by Dr. Schumacher at trial, the Schumachers provided no evidence of their horse inventory during the years at issue or that they even recorded such information. As a result, we have no way of determining the herd's value at that time or what its future value might have been. This factor favors the Commissioner.

E. *The Schumachers' Success in Other Activities*

The fact that a taxpayer has previously and profitably engaged in similar activities may show that the taxpayer has a profit objective. *See* Treas. Reg. § 1.183-2(b)(5). The Schumachers have been successful in other ventures, including Dr. Schumacher's veterinary practice, but none bears a similarity to their horse breeding activity. This factor is neutral.

F. *The Schumachers' History of Income or Losses*

A history of substantial losses may indicate that the taxpayer did not conduct the activity for profit. *See id.* subpara. (6). However, losses during the startup period of an activity do not necessarily indicate that it is not conducted for profit. *See Engdahl*, 72 T.C. at 669. The Schumachers began SQH operations in 2001, and it has not turned a profit since its inception, a trend they did not buck during the years at issue.[8] SQH experienced net farming losses ranging from $51,028 to $210,148 between 2010 and 2019. The Schumachers proffered no proof that SQH was in a startup phase, and their history of continuous and

---

[8] By way of analogy, the startup phase for a saddle-bred horse breeding operation may be five to ten years. *See Engdahl*, 72 T.C. at 669; *Farris v. Commissioner*, T.C. Memo. 1972-165, 31 T.C.M. (CCH) 821, 825. Here, SQH consistently incurred losses for at least 18 years.

**[\*13]** significant losses indicates a lack of a profit motive. The factor favors the Commissioner.

### G. *Amounts of Occasional Profits, if Any*

The amounts of occasional profits the taxpayer earned from the activity may show that the taxpayer had a profit motive. *See* Treas. Reg. § 1.183-2(b)(7). SQH has never turned a profit since its inception in 2001, a trend that continued through the years at issue. This factor favors the Commissioner.

### H. *The Schumachers' Financial Status*

The receipt of a substantial amount of income from sources other than the activity may indicate that the taxpayer does not intend to conduct the activity for profit. *See id.* subpara. (8). The Schumachers reported substantial income from sources other than SQH during the years at issue. This suggests they had the ability to absorb SQH's losses and would benefit from them insofar as they sheltered income from other sources. This factor favors the Commissioner.

### I. *Elements of Personal Pleasure*

The presence of recreational or personal motives in conducting an activity may indicate that the taxpayer is not conducting the activity for profit. *See id.* subpara. (9). However, a taxpayer's enjoyment of an activity does not show that the taxpayer lacks a profit objective if the activity is conducted for profit as shown by other factors. *See Jackson v. Commissioner*, 59 T.C. 312, 317 (1972); Treas. Reg. § 1.183-2(b)(9). The Schumachers derived substantial pleasure from breeding, raising, training, racing, and showing horses, and our review of the other factors indicates that the Schumachers did not have a profit motive. This factor favors the Commissioner.

### J. *Conclusion*

Of the nine factors listed in Treasury Regulation § 1.183-2(b), six favor the Commissioner, two favor the Schumachers, and one is neutral. After rounding up the factors and the facts and circumstances of this case, we hold that the Schumachers did not have an actual and honest objective to operate SQH for a profit during the years at issue. Accordingly, we sustain the Commissioner's disallowance of the Schumachers' claimed loss deductions attributable to SQH for the years

**[\*14]** at issue on the ground that they did not engage in the horse-related activity for profit within the meaning of section 183.

IV.     *Section 6662(a) Penalties*

The Code imposes a 20% penalty upon the portion of any underpayment of tax required to be shown on a return that is attributable to (among other things) "negligence" or a "substantial understatement of income tax."  I.R.C. § 6662(a) and (b)(1) and (2). Section 6662(d)(2)(A) generally defines "understatement" as the excess of the tax required to be shown on the return over the amount shown on the return as filed.  An understatement of income tax is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return.  *See* I.R.C. § 6662(d)(1)(A).

The Commissioner has the burden of production on this issue.  *See* I.R.C. § 7491(c); *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). The Schumachers' returns for 2017, 2018, and 2019 reported tax of $85,811, $40,046, and $60,829, respectively.  The deficiencies in the Notice of Deficiency amount to $62,266, $61,466, and $67,447 for the Schumachers' 2017, 2018, and 2019 tax years, respectively, and we have sustained large portions of those deficiencies such that the Schumachers' understatements of income tax likely exceed the greater of $5,000 and 10% of the tax required to be shown on their returns. Subject to Rule 155 computations that will be ordered on the basis of this Opinion, the Commissioner has likely met his burden of production to show a "substantial understatement of income tax."

The Commissioner's burden of production also requires that he show compliance with section 6751(b)(1).  *Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016).  Section 6751(b)(1) provides that no penalty "shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination."  The penalties were first communicated to the Schumachers on January 5, 2021.  The Commissioner met his burden of production by introducing into evidence a copy of the civil penalty approval form, which Group Manager Robert Mahon signed on October 16, 2020.  The Commissioner having met the burden of production, we turn to whether the Schumachers have proven that the penalties should not apply to them.

**[\*15]** No penalty is imposed under section 6662 with respect to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to [it]." I.R.C. § 6664(c)(1). "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Treas. Reg. § 1.6664-4(b)(1). Circumstances that may indicate reasonable cause and good faith include "an honest misunderstanding of fact or law" that is reasonable in the light of all of the facts and circumstances, including "the experience, knowledge, and education of the taxpayer." *Higbee*, 116 T.C. at 449 (citing *Remy v. Commissioner*, T.C. Memo. 1997-72). Reliance on professional advice constitutes reasonable cause if "(1) [t]he adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

The Schumachers have little knowledge of tax law. Dr. Schumacher is a veterinarian, and Mrs. Schumacher works with schoolchildren. *See Shelton v. Commissioner*, T.C. Memo. 2009-116, 97 T.C.M. (CCH) 1592, 1594 (finding that taxpayers' lack of experience and education in tax law supported a finding of reasonable cause); *cf. Reser v. Commissioner*, 112 F.3d 1258, 1268 (5th Cir. 1997) (finding that taxpayer-wife's law degree did not provide special knowledge of complex tax issues), *aff'g in part, rev'g in part* T.C. Memo. 1995-572. In addition the Schumachers received, and reasonably relied on, professional advice from Mr. Cruise specifically directed at SQH's compliance with section 183 during the years at issue. Mr. Cruise was an experienced accountant and enrolled agent. Dr. Schumacher had a longstanding relationship with Mr. Cruise. He relied on Mr. Cruise not only to prepare his personal tax returns but also to handle the bookkeeping and tax returns for Northeast for multiple decades. Each year, Mr. Cruise discussed the section 183 factors with the Schumachers and concluded that SQH was operated for profit within the meaning of section 183. Dr. Schumacher promptly replied to requests for additional information, and there is no indication he withheld information from Mr. Cruise. Since Mr. Cruise was a competent professional, the Schumachers provided all of the requisite information to him, and they actually relied on his judgment, the Schumachers have demonstrated reasonable cause. In the light of these facts, we hold that the Schumachers should not be saddled with the section 6662(a) accuracy-related penalties.

**[*16]** V.  *Conclusion*

The Schumachers did not engage in SQH's activities for a profit. We do not doubt that the Schumachers took exceptional care of SQH's horses and spent substantial time training them, but that alone does not show that they did so with a profit motive.  As for the section 6662 penalties, the Schumachers have acted with reasonable cause and good faith and are therefore not liable for the accuracy-related penalties determined for the years at issue.  We have considered all the arguments made by the parties and, to the extent that they are not addressed herein, we find them moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*